IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ISHMAEL AIL BURK, SR., | No. 1:19-CV-01358 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| J. RUNK, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### DECEMBER 28, 2021

Plaintiff Ishmael Ail Burk, Sr., was previously incarcerated at the State Correctional Institution at Smithfield (SCI Smithfield) in Huntingdon, Pennsylvania, during times relevant to this lawsuit. He filed this *pro se* Section 1983[1] action in 2019, alleging constitutional tort claims under the Eighth Amendment for failure to protect and deliberate indifference to serious medical needs. Presently pending is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.[2] The Court will grant in part and deny in part Defendants' Rule 56 motion.

---

[1] 42 U.S.C. § 1983. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

[2] Doc. 77.

I.      **FACTUAL BACKGROUND**[3]

Burk's Section 1983 claims arise from events that occurred in early April 2019 at SCI Smithfield while Burk was housed on "GA" block.[4] During that time, Burk was assaulted—without provocation—by his cellmate, "Inmate Waldron,"[5] three times in quick succession.[6] Although the exact dates of the first two assaults are uncertain, all of the attacks occurred within a span of approximately five days, with the last and most serious assault taking place on April 9, 2019.[7]

During the first attack, Waldron slapped Burk in the head with an open hand and threw a pair of underwear at him.[8] In his deposition, Burk explained that he suffered a "bad headache" that day from this attack but did not seek medical attention.[9] Burk reported the assault verbally and in writing to Unit Manager J.

---

[3] Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.* Unless otherwise noted, the following factual background derives from the parties' Rule 56.1 statements of material facts. *See* Docs. 79, 89. To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the Court cites directly to the Rule 56.1 statements.
[4] Doc. 79 ¶ 1; Doc. 79-1, Burk Depo. 5:20-24.
[5] Waldron's first name has not been identified by either party.
[6] Doc. 79 ¶¶ 2-3, 5-6.
[7] *Id.*; *see* Doc. 27-3 at 14 (noting that third assault occurred on April 9, 2019); Doc. 83-2 at 3 (same).
[8] Doc. 79 ¶ 3; Burk Depo. 11:2-4.
[9] Burk Depo. 11:20-12:1.

2

Runk the following day, telling Runk that he "needed to be removed from the cell."[10] Burk recalls that Runk did not believe him.[11]

The second assault occurred two days later.[12] During this incident, Waldron slapped Burk in the eye, causing redness.[13] Burk testified that this second attack took place near the glass "bubble" where defendant correctional officers Greene and Treaster were stationed, allowing them to witness the event.[14] According to Burk, he also verbally reported this second assault to Greene and Treaster, told them he "needed to be removed from the situation because it was getting serious," and requested to speak with security.[15] He maintains that, for his safety and on his own volition, he spoke with defendants Lieutenant Harper and Captain Eichenlaub in security about Waldron's assaultive conduct.[16]

Burk further testified that his mother, Sandra Burk, began calling SCI Smithfield after the first assault and speaking with Eichenlaub about Waldron's attacks.[17] She provided a notarized declaration recounting that her son "feared for his life" and that, upon informing Eichenlaub of the assaults, Eichenlaub had told

---

[10] Id. at 12:2-14.
[11] Id. at 12:16.
[12] Doc. 79 ¶ 5; Burk Depo. 18:11-18.
[13] Doc. 79 ¶ 5.
[14] Burk Depo. 19:10-18.
[15] Id. at 14:14-19, 18:2-6, 19:19-22.
[16] Id. at 18:7-10, 27:1-7, 28:11-24.
[17] Id. at 19:24-20:10, 27:8-12, 27:24-28:10.

3

her that Burk "allowed" the attacks to happen so that he could "get a cell switch[.]"[18]

Burk also testified that, following the second assault, he sent a request slip to the prison's medical department to get new glasses because his eye was "messed up" from the attack.[19] Burk addressed the request slip to defendant Health Care Administrator Bill Dreibelbis and received new glasses to correct the blurry vision caused by Waldron's assault.[20] He did not seek any additional medical treatment after receiving his glasses.[21]

The third and most serious attack occurred approximately two days after the second assault.[22] During this incident, Waldron punched Burk in the face and slapped him, knocking him to the ground near the cell door.[23] Burk's head struck the concrete floor, causing a concussion.[24] Burk testified that Greene was circulating on GA block and witnessed this third assault.[25] Burk also remembers

---

[18] *See* Doc. 82. Defendants take issue with Sandra Burk's notarized declaration, claiming it "is not sworn or accompanied by an affidavit" so it cannot be considered at the Rule 56 stage "to create a dispute of fact." Doc. 84 at 5. Defendants are incorrect. Federal Rule of Civil Procedure 56(c)(4) permits the use of declarations to support or oppose motions for summary judgment when they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Sandra Burk's declaration meets all these requirements.
[19] Burk Depo. 21:23-22:5.
[20] *Id.* at 22:6-22.
[21] *Id.* at 22:23-23:1.
[22] *Id.* at 18:14-24; Doc. 79 ¶ 6.
[23] Burk Depo. 15:20-24, 16:14-15.
[24] *Id.* at 15:22-16:6.
[25] *Id.* at 16:18-17:6.

reporting the incident to Greene on the way to the cafeteria,[26] as well as to Treaster later that day in the "TV room."[27]

Burk further maintains that he sent request slips to Runk after the second and third assaults, asking to be removed from confinement with Waldron, but did not receive any response.[28] He likewise testified that, when he received no response from Runk, he sent multiple request slips to defendant Superintendent Jamey P. Luther, explaining that Runk, Greene, and Treaster were ignoring his pleas to be moved to safety.[29] Burk believes that Luther responded to at least one of these request slips while he was still housed on GA block, but that she merely told Burk he would have to talk to Runk, his unit manager.[30]

Shortly after the third attack, Burk was moved to protective custody in the Restricted Housing Unit (RHU),[31] and was also seen by medical staff.[32] He believes that Dreibelbis was present in the RHU during this medical examination, which took place the same day Burk was moved to protective custody.[33]

---

[26] *Id.* at 17:7-11.
[27] *Id.* at 23:6-17.
[28] *Id.* at 25:6-26:2.
[29] Burk Depo. at 29:4-20.
[30] *Id.* at 29:7-9, 30:2-21, 31:6-14.
[31] *Id.* at 24:3-18; Doc. 79 ¶ 7.
[32] Doc. 79 ¶ 8.
[33] Burk Depo. 33:8-34:2.

According to Burk, the only medical attention he sought but was denied was a request to see a concussion specialist.[34]

Burk filed suit in August 2019 after his prison grievances were denied.[35] He asserts Eighth Amendment claims for failure to protect and for deliberate indifference to serious medical needs. Burk does not delineate which Eighth Amendment claims are directed at which Defendants, so it appears that he is asserting both constitutional violations against each Defendant. Defendants move for summary judgment on all claims.[36] Their Rule 56 motion is fully briefed and ripe for disposition.

## II.   STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[37] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[38] Material facts are those "that could alter the outcome" of the litigation, and "disputes are

---

[34] *Id.* at 34:3-21.
[35] *See generally* Docs. 1, 34.
[36] *See generally* Docs. 77, 78.
[37] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[38] FED. R. CIV. P. 56(a).

'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[39]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[40]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[41]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[42]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]."[43]  Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[44]

## III. DISCUSSION

Defendants raise numerous arguments for why judgment should be granted in their favor.  They contend that (1) there is a lack of personal involvement for

---

[39] *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).
[41] *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).
[42] *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).
[43] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).
[44] *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

Dreibelbis and Luther; (2) the Eighth Amendment failure-to-protect claims fail on the merits as to Eichenlaub, Greene, Harper, Runk, and Treaster; (3) alternatively, qualified immunity shields Eichenlaub, Greene, Harper, Runk, and Treaster from liability; (4) Burk's Eighth Amendment medical care claims cannot advance because no medical attention was denied; and (5) Burk did not administratively exhaust his claim for money damages. The Court will address each of Defendants' arguments, but in a different order.

### A. Deliberate Indifference to Serious Medical Needs

As previously explained, Burk does not specify which Defendants he alleges were deliberately indifferent to his medical needs, but it appears that he is asserting this Eighth Amendment claim against all seven Defendants. However, it is readily apparent from the record that Burk cannot meet his Rule 56 burden as to this constitutional tort.

The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment on prisoners.[45] In the context of prison medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated."[46] To establish an Eighth Amendment deliberate indifference claim regarding inadequate medical care, a

---

[45] *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).
[46] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

8

plaintiff must demonstrate (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need."[47] A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."[48]

Deliberate indifference by prison officials may be evidenced by intentional refusal to provide care known to be medically necessary, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, and denial of reasonable requests for treatment resulting in unnecessary suffering or risk of injury.[49] Deliberate indifference to serious medical needs is an exacting standard, requiring a showing of "unnecessary and wanton infliction of pain."[50] Claims sounding in mere medical negligence will not suffice.[51]

Burk has failed to adduce any evidence showing deliberate indifference to a serious medical need. By Burk's own admission, the first attack caused only a headache and he did not seek medical attention for it. As to the second assault, although this incident caused redness and vision problems, Burk promptly received the medical care that he requested. After the third attack, Burk was immediately

---

[47] *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).
[48] *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).
[49] *See Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993) (quoting *Lanzaro*, 834 F.2d at 346).
[50] *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).
[51] *Rouse*, 182 F.3d at 197.

attended to by medical staff, including Dreibelbis, in the RHU. Nothing in the record reflects "unnecessary and wanton infliction of pain" that would substantiate a claim of deliberate indifference.

Burk's single complaint about his medical treatment appears to be that Dreibelbis did not refer Burk to a concussion specialist. But it is well settled that "mere disagreement as to proper medical care" does not implicate deliberate indifference.[52] At most, failure to refer Burk to a concussion specialist may imply medical malpractice, yet that is insufficient to support a constitutional claim of deliberate indifference to serious medical needs. Because Burk has failed to establish that any Defendant was deliberately indifferent to a serious medical need, the Court must enter judgment in Defendants' favor on these Eighth Amendment claims.

### B. Administrative Exhaustion of Monetary Damages

The Prison Litigation Reform Act of 1995 (PLRA)[53] requires prisoners to exhaust available administrative remedies before suing prison officials for alleged constitutional violations.[54] Proper exhaustion is mandatory, even if the inmate is seeking relief—like monetary damages—that cannot be granted by the

---

[52] See *Lanzaro*, 834 F.2d at 346.
[53] 42 U.S.C. § 1997e *et seq*.
[54] See 42 U.S.C. § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted).

10

administrative system.[55] The exhaustion process a prisoner must follow is governed by the contours of the prison grievance system in effect where the inmate is incarcerated.[56]

Pennsylvania's Department of Corrections (DOC) employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.[57] If informal resolution attempts do not resolve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."[58] An adverse decision by the grievance coordinator may be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.[59] Finally, the decision of the Facility Manager may be appealed to "Final Review" with the Secretary's Office of Inmate Grievances and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision.[60]

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance contain "a

---

[55] *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).
[56] *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Woodford*, 548 U.S. at 90-91.
[57] *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); COMMONWEALTH OF PA., DEP'T OF CORRECTIONS, INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804").
[58] DC-ADM 804 § 1(A)(3)-(5).
[59] *Id.* § 2(A)(1).
[60] *Id.* § 2(B)(1).

statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court."[61]

The Court has already addressed the issue of exhaustion of administrative remedies in an earlier decision.[62] In its May 26, 2020 Memorandum and Order, the Court denied Defendants' Rule 56 motion asserting failure to comply with administrative procedures and failure to identify all Defendants.[63] Defendants now contend that Burk failed to request money damages in his grievances and therefore procedurally defaulted on the only relief sought in this Section 1983 lawsuit. Burk counters that he amended his grievances to include a request for monetary relief.

The Court need not delve into this dispute. The only remaining claims in this lawsuit are Burk's assertions that Runk, Greene, Treaster, Eichenlaub, Harper, and Luther failed to act to protect him from Waldron's increasingly assaultive conduct.[64] This type of emergency claim is one that, according to DOC policy, requires much less than the full grievance process to properly exhaust.[65]

---

[61] *Id.* § 1(A)(11).
[62] *See* Doc. 34.
[63] *See id.* at 9-11.
[64] It is unclear whether Burk is asserting an Eighth Amendment failure-to-protect claim against Dreibelbis. Nevertheless, as discussed *infra* in Section III(C), such a claim is meritless.
[65] *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 306-07 (3d Cir. 2020).

DC-ADM 804 states that the inmate grievance system, although intended to deal with a wide array of prison issues, "is not meant to address incidents of an urgent or emergency nature[.]"[66] Instead, such time-sensitive issues should be raised to "the nearest staff member for immediate assistance."[67]

Burk was physically assaulted three times by his cellmate in a matter of days, with each attack becoming more vicious. This is the type of urgent situation that is explicitly excepted from the DOC's formal inmate grievance process, which can take months to fully resolve.[68] All that Burk was required to do was to "contact the nearest staff member for immediate assistance,"[69] and it is undisputed that he did so. In fact, Burk repeatedly contacted multiple prison officials, asking to be moved to safer housing. Thus, because Burk was not required to grieve his failure-to-protect claims through the typical inmate grievance process, he was not required to pursue monetary damages through that process, either.[70] Defendants' exhaustion argument, therefore, is meritless.

---

[66] DC-ADM 804 § 1(A)(2).
[67] *Id.*
[68] *See Downey*, 968 F.3d at 307.
[69] DC-ADM 804 § 1(A)(2).
[70] *See Downey*, 968 F.3d at 307 (explaining that, because inmate "was not required to submit a grievance due to the urgency of his situation," provision of DC-ADM 804 requiring that monetary damages be grieved was likewise inapplicable).

### C.     Personal Involvement

It is well established that, in Section 1983 actions, liability cannot be "predicated solely on the operation of *respondeat superior*."[71] Rather, a Section 1983 plaintiff must establish facts that demonstrate "the defendants' personal involvement in the alleged misconduct."[72] Personal involvement can include direct wrongful conduct by a defendant, but it can also be demonstrated through a defendant's "personal direction" or "actual knowledge and acquiescence."[73]

Defendants Dreibelbis and Luther maintain that Burk has failed to show any involvement by them in the Eighth Amendment failure-to-protect claims. They are half right.

The record demonstrates that, if Burk is lodging a failure-to-protect claim against Dreibelbis, such a claim is unsupported by any evidence. Burk's only involvement with Dreibelbis consists of sending him a request slip for new glasses after the second attack and being seen by him in the RHU following the third attack. Burk has provided no evidence that Dreibelbis was informed of Waldron's assaults and failed to take action.

---

[71] *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted); *see also Ashcroft v. Iqbal*, 556. U.S. 662, 676 (2009) (affirming same principle in *Bivens* context).
[72] *Dooley*, 957 F.3d at 374.
[73] *Id.* (quoting *Rode*, 845 F.2d at 1207).

14

The record is less certain with respect to Luther. Burk testified that he sent multiple request slips to Luther after the second assault when Runk, Greene, and Treaster failed to act. Burk recalls that Luther responded to him at least once while he was still housed on GA block, and merely told him to talk to his unit manager (the same unit manager whom Burk had complained was ignoring his pleas to be moved to safety). Without any countervailing evidence from Luther, the Court cannot conclude that her actions do not demonstrate the requisite personal involvement in Burk's failure-to-protect claims.

### D.   Merits of Eighth Amendment Failure-to-Protect Claims

Defendants next argue that Burk has failed to establish evidence of a substantial risk of serious harm sufficient to bring his failure-to-protect claims to trial. The Court concludes the opposite.

Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners."[74] That is because being "violently assaulted in prison" is not part of the penalty imposed on criminals as a penance for their offenses against society.[75] To establish such a claim for damages against a prison official, the inmate must show "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was

---

[74]  *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012), *abrogated on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).
[75]  *Farmer*, 511 U.S. at 834.

deliberately indifferent to that substantial risk to [the prisoner's] health and safety, and (3) the official's deliberate indifference caused [the prisoner] harm."[76] In this context, deliberate indifference is a subjective standard; that is, "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."[77] Actual knowledge or awareness of a substantial risk to an inmate's safety can be proven "in the usual ways, including inference from circumstantial evidence."[78]

Because action was taken immediately after Waldron's third assault—*i.e.*, Burk was moved to protective custody—the focus of Burk's failure-to-protect claims must be the acts or omissions of Defendants following the first and second attacks. In this regard, Defendants challenge the first prong of Burk's failure-to-protect claims. They contend that Burk has not established that he was incarcerated under conditions posing a substantial risk of "serious harm" such that the remaining Defendants could be found to have been deliberately indifferent to that risk.[79]

Defendants seek to downplay the first two attacks. They argue that because Burk was merely slapped twice by Waldron, sustaining injuries "suffered by

---

[76] *Bistrian*, 696 F.3d at 367 (citing *Farmer*, 511 U.S. at 834).
[77] *Id.* (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001)).
[78] *Id.* (quoting *Farmer*, 511 U.S. at 842).
[79] Doc. 78 at 7-8.

16

children on playgrounds on a daily basis," none of the remaining Defendants could have appreciated that Burk's conditions of incarceration posed a substantial risk of serious harm.[80]  The Court disagrees.

First, it must be noted that Waldron's second assault was severe enough to cause vision damage.  Such an attack is considerably more serious than a "playground" injury.  Second, according to Defendants' logic, a prison official could only be liable for failure to protect if an inmate who is repeatedly assaulted by his cellmate (and who reports the assaults) sustains serious or life-threatening injuries each time he is attacked.  That is not the law.  It is enough that the prison official is put on notice that the inmate was facing a substantial risk of serious harm, not that he already suffered such harm and could suffer it again.[81]  A reasonable trier of fact could conclude that being housed with Waldron after his attacks, especially one causing vision impairment, implicated a substantial risk of serious harm to Burk—*i.e.*, that Burk would be physically assaulted again.

Burk has proffered evidence that he informed Runk, Greene, Treaster, Eichenlaub, Harper, and Luther that Waldron was violent, that Waldron had

---

[80] *Id.* at 8.
[81] *See Hamilton v. Leavy*, 117 F.3d 742, 746-47 (3d Cir. 1997) (finding that prison official could be held liable for transferring plaintiff to a prison where he was attacked because official knew of excessive risk to plaintiff's safety and failed to act); *Young v. Quinlan*, 960 F.2d 351, 362-63 (3d Cir. 1992) (holding that prison officials, who ignored inmate's repeated notifications of physical assaults and requests for placement in protective custody, could be found deliberately indifferent).

17

attacked him without provocation, and that Burk needed to be moved for safety reasons.  Viewing the evidence in a light most favorable to Burk, the record reflects the following facts: Runk was made aware—both verbally and in writing—of Burk's serious safety concerns after the first and second attacks, which occurred only a day or two apart; Eichenlaub and Harper were notified of the risk to Burk's safety directly by Burk after the second assault, and Eichenlaub was also informed by Burk's mother, who called Eichenlaub on several occasions to tell him that Burk was being attacked and that he feared for his life; Greene and Treaster witnessed the second attack and were likewise verbally apprised by Burk of his grave safety concerns; and Luther was informed of the risk through multiple request slips, in which Burk pleaded with her to take action because other prison officials were ignoring his requests for help.

Under such circumstances, the Court cannot conclude that these prison officials were unable to appreciate the substantial risk of serious harm that Burk faced while he continued to be housed with Waldron.[82]  This case presents facts similar to *Young v. Quinlan*, where an inmate's failure-to-protect claim survived summary judgment when he presented evidence that he had "told [ten named prison officials] several times that he was concerned for his safety and needed to

---

82   Of course, if any Defendant had responded reasonably to the risk Burk faced, such conduct would obviate liability.  See *Hamilton*, 117 F.3d at 748.  But Defendants have not proffered allegations or evidence that they took *any* action to protect Burk until after the third assault.

be placed in protective custody," and each of the officials failed to respond reasonably to prevent the inmate from being assaulted by other prisoners.[83]

### E. Qualified Immunity

Lastly, Defendants assert that, even if their actions "violated a constitutional right," qualified immunity "shield[s] them from liability."[84] Defendants are mistaken. Because Burk has made a showing sufficient to overcome Defendants' Rule 56 motion as to the merits of his failure-to-protect claim,[85] he has "also made a showing sufficient to overcome any claim to qualified immunity."[86] That is because "deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant," and thus "a defendant cannot have qualified immunity if [he or] she was deliberately indifferent."[87] Stated differently, "[c]onduct that is deliberately indifferent to an excessive risk [of serious harm] cannot be objectively reasonable conduct."[88]

---

[83] *Bistrian*, 696 F.3d at 370 (alteration in original) (quoting *Young*, 960 F.2d at 363).
[84] Doc. 78 at 9.
[85] The Eighth Amendment right for an inmate to be protected from violence at the hands of other prisoners is clearly established. *See Farmer*, 511 U.S. at 833-34; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Hamilton*, 117 F.3d at 746; *Young*, 960 F.2d at 362-63.
[86] *Beers-Capitol*, 256 F.3d at 142 n.15.
[87] *Id.*
[88] *Id.* (rejecting qualified immunity defense for failure-to-protect claim and citing *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999) (holding that, if the plaintiff succeeds in establishing that defendants acted with deliberate indifference to constitutional rights, then *a fortiori* defendants' conduct was not objectively reasonable, and hence defense of qualified immunity would not be available)).

Burk has adduced sufficient evidence as to the first element of his failure-to-protect claim—the only element challenged by Defendants. He has also proffered evidence of deliberate indifference by Defendants to the clearly established right to be protected against violence at the hands of his cellmate. Qualified immunity, therefore, does not shield Defendants from potential liability on this claim.[89] Consequently, the Court must deny summary judgment as to the Eighth Amendment failure-to-protect claims against Runk, Greene, Treaster, Eichenlaub, Harper, and Luther.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendants' motion (Doc. 77) for summary judgment, as more fully explained above. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[89] *See id.*